IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

JEROME SILO
V
U.S.A, ET AL

CIVIL NO. 05-1016
UNA

RE: ORDER DATED 7-15-05, ENTERED 7-19-05
DENIED MOTION TO STAY

(ORDER ENTERED 7-19-05)

NOTICE TO APPEAL
(TO D.C. CIRCUIT COURT)

TO SHOW — (A) SEE OLMSTEAD V. L.C. (B) SEE QUESTION PRESENTED (C) SEE [illegible] SCALIA REMARKS

(A) DISMISSAL ORDER WAS INVALID BECAUSE SILO CANNOT BE PENALIZED BY FAILURE TO "WANT TO WAIVE" → DIXON (5TH CIR 1961) CERT DENIED 1961 — RIGHT (UNDER DIXON) FOR SILO TO SHOW IT IS UNCONSTITUTIONAL FOR DISTRICT COURT TO OFFER RIGHT OR PRIVILEGE TO SILO TO LITIGATE 05-1016 CONDITIONED ON SILO'S WILLINGNESS TO WAIVE THE RIGHT TO PREEMPTIVELY FIRST BE PROVIDED RIGHT TO BE HEARD TO SHOW ROMER V. EVANS, 116 SCT AT 1623 (1996) AND LAWRENCE V. TEXAS, 539 U.S. ___ 6-26-03, WHICH RULED THAT ROMER "ERODED" THE "FOUNDATIONS" OF RATIONAL BASIS TEST USED IN TUCKER V. BRANKER (DC CIR 1998) TO UPHOLD PLRA IFP FEE!

YOU CANT PENALIZE SILO FOR NOT COMPLYING TO INVALID PLRA!!

2

(2) IT IS ERRONEOUS ALSO TO SAY "NATURE OF SUIT: 555 PRISON CONDITION" IN DKT ENTRIES PAGE ONE - 05-1016 DOES NOT COME UNDER PURVIEW OF PLRA SO DISMISSAL FOR FAILURE TO COMPLY WITH "INAPPLICABLE" STATUTE IS INVALID. NO PRISON CONDITION IS MENTIONED IN SILO'S SUIT!! [illegible]

8-15-05 [signature]

PROOF OF SERVICE

ON 8-15-05 COPY MAILED TO ATTORNEY GENERAL OF U.S. 950 PENN. AVE NW WASH, D.C. 20530

[signature]

(KEY) PAGE 1623 OF ROMER SOLVES SILO'S ARGUMENT

INDISPUTABLE FACT: ——

ROMER AND LAWRENCE INVALIDATED PLRA IFP RULE BY STOPPING USE OF "RATIONAL BASIS" TEST TO JUSTIFY $250 FEE FOR IFP PRISONER (DISFAVORED POPULATION GROUP)

(KEY)

RECEIVED AUG 1 8 2005 NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT

of their disability. This inquiry would not be simple. Comparisons of different medical conditions and the corresponding treatment regimens might be difficult, as would be assessments of the degree of integration of various settings in which medical treatment is offered. For example, the evidence might show that, apart from services for the mentally disabled, medical treatment is rarely offered in a community setting but also is rarely offered in facilities comparable to state mental hospitals. Determining the relevance of that type of evidence would require considerable judgment and analysis. However, as petitioners observe, "[i]n this case, no class of similarly situated individuals was even identified, let alone shown to be given preferential treatment." Brief for Petitioners 21. Without additional information regarding the details of state-provided medical services in Georgia, we cannot address the issue in the way the statute demands. As a consequence, the judgment of the courts below, granting partial summary judgment to respondents, ought not to be sustained. In addition, as Justice GINSBURG's opinion is careful to note, *ante*, at 2189, it was error in the earlier proceedings to restrict the relevance and force of the State's evidence regarding the comparative costs of treatment. The State is entitled to wide discretion in adopting its own systems of cost analysis, and, if it chooses, to allocate health care resources based on fixed and overhead costs for whole institutions and programs. We must be cautious when we seek to infer specific rules limiting States' choices when Congress has used only general language in the controlling statute.

I would remand the case to the Court of Appeals or the District Court for it to determine in the first instance whether a statutory violation is sufficiently alleged and supported in respondents' summary judgment materials and, if not, whether they should be given leave to replead and to introduce evidence and argument along the lines suggested above.

For these reasons, I concur in the judgment of the Court.

Justice THOMAS, with whom THE CHIEF JUSTICE and Justice SCALIA join, dissenting.

Title II of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, as set forth in 42 U.S.C. § 12132, provides:

> "Subject to the provisions of this subchapter, no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or *be subjected to discrimination* by any such entity." (Emphasis added.)

The majority concludes that petitioners "discriminated" against respondents—as a matter of law—by continuing to treat them in an institutional setting after they became eligible for community placement. I disagree. Temporary exclusion from community placement does not amount to "discrimination" in the traditional sense of the word, nor have respondents shown that petitioners "discriminated" against them "by reason of" their disabilities.

Until today, this Court has never endorsed an interpretation of the term "discrimination" that encompassed disparate treatment among members of the *same* protected class. Discrimination, as typically understood, requires a showing that a claimant received differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic. This interpretation comports with dictionary definitions of the term discrimination, which means to "distinguish," to "differentiate," or to make a "distinction in favor of or against, a person or thing based on the group, class, or category to which that person or thing belongs rather than on individual merit." Random House Dictionary 564 (2d ed.1987); see also Webster's Third New International Dictionary 648 (1981) (defining "discrimination" as "the making or perceiving of a distinction or difference" or as "the act, practice, or an instance of discriminating categorically rather than individually").

Our decisions construing various statutory prohibitions against "discrimination" have not wavered from this path. The best place to begin is with Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, the paradigmatic anti-discrimination law.[1] Title VII makes it "an unlawful employment practice for an employer ... to *discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). We have explained that this language is designed "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[2]

Under Title VII, a finding of discrimination requires a comparison of otherwise similarly situated persons who are in different groups by reason of certain characteristics provided by statute. See, *e.g.*, *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 683, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (explaining that Title VII discrimination occurs when an employee is treated " 'in a manner which but for that person's sex would be different' ") (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 711, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). For this reason, we have described as "nonsensical" the comparison of the racial composition of different classes of job categories in determining whether there existed disparate impact discrimination with respect to a particular job category. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 651, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).[3] Courts interpreting Title VII have held that a plaintiff cannot prove "discrimination" by demonstrating that one member of a particular protected group has been favored over another member of that same group. See, *e.g.*, *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (C.A.7 1993), cert. denied, 511 U.S. 1071, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994) (explaining that under Title VII, a fired black employee "had to show that although he was not a good employee, equally bad employees were treated more leniently by [his employer] if they happened not to be black").

Our cases interpreting § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, which prohibits "discrimination" against

1. We have incorporated Title VII standards of discrimination when interpreting statutes prohibiting other forms of discrimination. For example, Rev. Stat. § 1977, as amended, 42 U.S.C. § 1981, has been interpreted to forbid all racial discrimination in the making of private and public contracts. See *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). This Court has applied the "framework" developed in Title VII cases to claims brought under this statute. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Also, the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U.S.C. § 623(a)(1), prohibits discrimination on the basis of an employee's age. This Court has noted that its "interpretation of Title VII ... applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.' " *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (quoting *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)). This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq.*, which prohibits discrimination under any federally funded education program or activity. See *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (relying on *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a Title VII case, in determining that sexual harassment constitutes discrimination).

2. This Court has recognized that two forms of discrimination are prohibited under Title VII: disparate treatment and disparate impact. See *Griggs*, 401 U.S., at 431, 91 S.Ct. 849 ("The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"). Both forms of "discrimination" require a comparison among classes of employees.

3. Following *Wards Cove*, Congress enacted the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071, as amended, which, *inter alia*, altered the burden of proof with respect to a disparate impact discrimination claim. See *id.*, § 105 (codified at 42 U.S.C. § 2000e–2(k)). This change highlights the principle that a departure from the traditional understanding of discrimination requires congressional action. Cf. *Field v. Mans*, 516 U.S. 59, 69–70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (Congress legislates against the background rule of the common law and traditional notions of lawful conduct).



EXHIBIT "A"

THIS TYPE OF "DISPARATE TREATMENT" IS ADA—"DISCRIMINATION" AGAINST SILO, ET AL (LTR PRISONERS)

* LONG TERM CARE SILO IS A MEMBER OF SAME PROTECTED CLASS OF LONG TERM CARE RESIDENT IN A NURSING HOME WHO CAN FILE IFP SUIT AND NOT PAY $250 FILING FEE

QUESTION PRESENTED

WHETHER AN INFIRM ELDERLY BEDRIDDEN STATE PRISONER, WHO IS CLASSIFIED AS A "LONG-TERM CARE" INMATE, ..... IS ENTITLED TO A "STRICT SCRUTINY" STANDARD OF ANALYSIS OF HIS CLAIM THAT..... "AS APPLIED TO" ..... (AN ADA-COVERED UNABLE TO WORK TO EARN MONEY IFP PRISONER) ..... THE PRISON LITIGATION REFORM ACT (PLRA) IFP PRISONER COURT FILING FEE PROVISION, AND OTHER PLRA PROVISIONS, ARE INVALID FOR VIOLATING HIS EQUAL PROTECTION CLAUSE RIGHTS, AND ..... ARE INVALID ALSO FOR VIOLATING THE FEDERALLY PROTECTED STATUTORY ADA RIGHTS OF SUCH PERSONS BY SUBJECTING THEM TO A VIOLATIVE FORM OF ADA-"DISCRIMINATION," WITHIN THE MEANING OF THE DRAMATICALLY EXPANDED INTERPRETATION OF THE TERM "DISCRIMINATION" ESTABLISHED BY OLMSTEAD v. L.C., 119 S.Ct. 2176 (1999).

EXHIBIT "B"

EXHIBIT "C"

LAWRENCE V. TEXAS



issue in *Roe*, is offered as a reason in favor of *overruling* it. See *ante*, at 15–16. Gone, too, is any "enquiry" (of the sort conducted in *Casey*) into whether the decision sought to be overruled has "proven 'unworkable,'" *Casey*, *supra*, at 855.

Today's approach to *stare decisis* invites us to overrule an erroneously decided precedent (including an "intensely divisive" decision) *if*: (1) its foundations have been "eroded" by subsequent decisions, *ante*, at 15; (2) it has been subject to "substantial and continuing" criticism, *ibid.*; and (3) it has not induced "individual or societal reliance" that counsels against overturning, *ante*, at 16. The problem is that *Roe* itself—which today's majority surely has no disposition to overrule—satisfies these conditions to at least the same degree as *Bowers*.

(1) A preliminary digressive observation with regard to the first factor: The Court's claim that *Planned Parenthood* v. *Casey*, *supra*, "casts some doubt" upon the holding in *Bowers* (or any other case, for that matter) does not withstand analysis. *Ante*, at 10. As far as its holding is concerned, *Casey* provided a *less* expansive right to abortion than did *Roe*, *which was already on the books when Bowers was decided*. And if the Court is referring not to the holding of *Casey*, but to the dictum of its famed sweet-mystery-of-life passage, *ante*, at 13 ("'At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life'"): That "casts some doubt" upon either the totality of our jurisprudence or else (presumably the right answer) nothing at all. I have never heard of a law that attempted to restrict one's "right to define" certain concepts; and if the passage calls into question the government's power to regulate *actions based on* one's self-defined "concept of existence, etc.," it is the passage that ate the rule of law.

I do not quarrel with the Court's claim that *Romer* v. *Evans*, 517 U. S. 620 (1996), "eroded" the "foundations" of *Bowers*' rational-basis holding. See *Romer*, *supra*, at 640–





BY ANALOGY... ROMER "ERODED" THE "FOUNDATIONS" OF THE "RATIONAL-BASIS" HOLDING IN TUCKER V. BRANKER 142 F.3d 1294 (D.C. CIR. 1998).

IN OTHER WORDS,... THE "CLASS-BASED" LEGISLATION OF THE PLRA HAS BEEN INVALIDATED ON 6-26-03 BY THE U.S. SUPREME COURT IN LAWRENCE V. TEXAS. THIS IS INDISPUTABLE!

* SEE: ROMER V. EVANS AT 116 S.CT 1620, AT 1623 (1996) WHERE ROMER CITED THE "PRINCIPLE" STATED BY JUSTICE HARLAN IN HIS 1896 DISSENTING OPINION .... AND MADE IT THE "LAW OF THE LAND." E.G., THE CONSTITUTION "NEITHER KNOWS NOR TOLERATES CLASSES AMONG CITIZENS." IT WAS [THIS] WHICH "ERODED" THE "FOUNDATIONS" OF THE RATIONAL-BASIS HOLDING IN BOWERS AND TUCKER!!!